SHARP, W., J.
United Specialties of America (USA) and Kaskam, Inc. (Kaskam) appeal from orders of the Florida Department of Revenue which denied their requests for a refund of the aviation fuel tax on kerosene, which they paid. In appeal number 5D00-268, USA requested a refund for the time period July 1996 through February 1997. In two appeals, No. 5D00-268 and 5D00-771, Kaskam requested a refund for the time periods March 1997 through June 1999 and from September 1999 through December 1999.[1] The Department determined that the companies’ use of kerosene was not exempt from taxation under section 206.9825, the aviation fuel tax statute, and it denied their requests for refunds. Because the facts and legal issues are identical in all of the appeals, they were consolidated. We affirm.
The record established that for all of the transactions involved in these appeals, the companies sold undyed kerosene in one gallon or less containers to retailers and hardware distributors. The retailers and distributors, in turn, sold the kerosene in the same containers, to consumers for non-aviation fuel uses. USA and Kaskam argue that although imposition of the tax is apparently clear under section 206.9825(3)(a), its meaning is ambiguous when considered with other sections of the same statute and chapter titles. As such, they are entitled to the benefit of the doubt. See Miller v. Agrico Chemical Co., 383 So.2d 1137 (Fla. 1st DCA 1980).
Effective July 1, 1996, Chapter 96-323, §§ 20 and 21, amended sections 206.9815 and 206.9825 to include definitions for the terms “kerosene” and “aviation gasoline” and to provide for the taxation of kerosene and aviation gasoline. These sections now provide:
206.9815. Definitions
As used in this part:
(1) “Aviation fuel” means fuel for use in aircraft, and includes aviation gasoline and aviation turbine fuels and kerosene, as determined by the American Society for Testing Materials specifications D 910 or D 1655 or current specifications.
(2) “Kerosene” means all aviation turbine fuels and any distillate known as diesel, K 1, or any product suitable for use as a substitute for kerosene not taxed as a diesel fuel under part II. Any kerosene meeting the definition of diesel under s. 206.86(1) shall be taxed under part II.
(3) “Aviation gasoline” means any motor fuel blended or produced specifically for use in aircraft which has been dyed in accordance with federal regulations. Aviation gasoline does not include any such fuel used in any manner other than being placed in the storage tank of an aircraft.
206.9825. Aviation fuel tax
(l)(a) Except as otherwise provided in this part, an excise tax of 6.9 cents per gallon of aviation fuel is imposed upon every gallon of aviation fuel sold in this state, or brought into this state for use, upon which such tax has not been paid or the payment thereof has not been lawfully assumed by some person handling the same in this state....
[[Image here]]
(3)(a) An excise tax of 6.9 cents per gallon is imposed on each gallon of kerosene in the same manner as 'prescribed *1212 for diesel fuel under ss. 206.87(2) and 206.872.
(b) The exemptions provided by s. 206.874 shall apply to kerosene if the dyeing and marking requirements of s. 206.8741 are met.
(c) Kerosene prepackaged in containers of 5 gallons or less and labeled “Not for Use in a Motor Vehicle” is exempt from the taxes imposed by this part when sold for home heating and cooking. Packagers may qualify for a refund of taxes previously paid, as prescribed by the department, (emphasis added)
It appears that section 206.9825(3)(a) imposes an “excise tax” on each gallon of kerosene sold, generally and in all cases,[2] *1213 unless specifically exempted either by section 206.874, or by (c) of the same subsection quoted above. Appellants do not contend that either of the two exemptions applies to these transactions. Rather, they point out that the tax is imposed under Part III of the statute entitled “Aviation Fuel,” that section 206.9825 is entitled “Aviation Fuel Tax,” and that the statute defines “aviation fuel” as fuel used in. aircraft.
Legislative history of the statute appears to support appellants’ argument that kerosene was only intended to be taxed when it was used as jet fuel. The Senate Staff Analysis and Economic Impact Statement lists the effect of the proposed changes to the law as follows:
Section 206.9815, F.S., is amended to provide a definition of products which are subject to aviation fuel tax imposed under part III of this chapter.
Section 206.9825, F.S., is amended to provides [sic] a tax on kerosene when it is used as jet fuel and provides an exemption for kerosene when it is used for home heating or cooking ...
However, as pointed' out above, section 206.9825(3) provides exemptions from taxation for kerosene which are quite limited and specific. There are many other uses of kerosene or transactions involving the sale of kerosene, which are not within those exemptions, including the transactions involved in this case, which do not involve sales of kerosene for use as jet fuel. If only sales of kerosene for jet fuel are subject to the tax, then there would be no need for the specific exemptions.
As the Departmént points out, a fundamental rule of statutory interpretation is that the courts should avoid a construction that would render part 6f a statute meaningless. Whenever .pbssible, courts should give effect to all statutory provisions and construe them in harmony with one another. This impliments the general rule of statutory construction that the Legislature does not intend to enact purposeless and therefore useless legislation. Beach v. Great Western Bank, 692 So.2d 146 (Fla.1997), affirmed, 523 U.S. 410, 118 S.Ct. 1408, 140 L.Ed.2d 566 *1214 (1998); Unruh v. State, 669 So.2d 242 (Fla.1996).
Perhaps the seeming inconsistencies arise because the legal definitions and treatment of these products do not necessarily comport with their scientific definitions or composition. “Kerosene” is defined as:
A colorless, thin oil that is less dense than water. It is a mixture of hydrocarbons commonly obtained in the fractional distillation of petroleum, but also from coal, oil shale, and wood. Once the most important refinery product because of its use in lamps, kerosene is now used chiefly as a carrier in insecticide sprays and as a fuel in jet engines.
The Concise Columbia Electronic Encyclopedia (3d ed.1994) http://www.encyclope-dia. comlarticlesl06920.html.
As explained in “How Stuff Works,” gasoline, kerosene, and diesel fuel all are derived from crude oil:
The “crude oil” pumped out of the ground is a black liquid called petroleum. This liquid contains aliphatic hydrocarbons, or hydrocarbons composed of nothing but hydrogen and carbon. The carbon atoms link together in chains of different lengths.
It turns out that hydrocarbon molecules of different lengths have different properties and behaviors. For example, a chain with just one carbon atom in it (CH4) is the lightest chain, known as methane. Methane is a gas so light, in fact, that it floats like helium. As the chains get longer they get heavier. The first 4 chains (CH4, C2H6, C3H8 and C4 H10 or methane, ethane, propane and butane) are all gases that boil at -161, - 88, -46 and -1 degrees F respectively. The chains up through C18H32 or so are all liquids and the chains above C19 are solids at room temperature.
The different chain lengths all have progressively higher boiling points, so they can all be separated by distillation. This is what happens in an oil refinery— crude oil is heated and the different chains are pulled out by their vaporization temperatures.
The chain lengths in the C5, C6 and C7 range are all very light, easily vaporized clear liquids called naphthas. They are used as solvents — dry cleaning fluids can be made from these liquids, as are paint solvents and other quick-drying products.
The chain lengths from C7H16 through ⅛¾ are blended together and used for gasoline. All of them vaporize at temperatures below the boiling point of water.
Next is kerosene in the C12 to C16 range, followed by diesel fuel and heavier fuel oils (like heating oil for houses).
Next come the lubricating oils. These oils no longer vaporize in any way at normal temperatures (for example, engine oil can run all day at 250 degrees F without vaporizing at all). Oils go from very light (like 3-in-l oil) though various thicknesses of motor oil through very thick gear oils and then semi-solid greases. Vasoline falls in there as well.
Chains above the C20 range form solids, starting with paraffin wax, then tar and finally asphaltic bitumen used to make asphalt roads.
http://www.howstuffworks.com/ques-tionl05.htm.
Perhaps the Legislature should have labeled the tax as a “petroleum product” or a “fuel” tax rather than an “aviation fuel” tax, and defined kerosene by its chemical composition. In any event, it appears from the clear language of the statute that the Legislature intended to tax kerosene in the same manner as diesel fuel, with no requirement that kerosene be used for aviation purposes. Donato v. American Telephone & Telegraph Co., 767 So.2d 1146 *1215 (Fla.2000); M.W. v. Davis, 756 So.2d 90 (Fla.2000); Florida Birth-Related Neurological Injury Compensation Association v. Florida Division of Administrative Hearings, 686 So.2d 1349 (Fla.1997).
USA and Kaskam also argue that if section 206.9825 taxes nonaviation kerosene, it violates the “single subject” requirement of Article III, section 6 of the Florida Constitution. It provides:
Every law shall embrace but one subject and matter properly connected therewith, and the subject shall be briefly expressed in the title. No law shall be revised or amended by reference to its title only. Laws to revise or amend shall set out in full the revised or amended act, section, subsection or paragraph of a subsection. The enacting clause of every law shall read: ‘Be it Enacted by the Legislature of the State of Florida.’
But any possible single subject violation was cured when the law was adopted and codified by the Legislature. See Salters v. State, 758 So.2d 667 (Fla.2000); State v. Johnson, 616 So.2d 1 (Fla.1993). Thus any claim for refunds paid after adoption of the law are barred. However as to taxes paid July 1996 through adoption of chapter 96-323 the following year, this issue is viable.
In Burch v. State, 558 So.2d 1 (Fla.1990), the Florida Supreme Court explained that the single subject requirement is intended to prevent the evil of “log rolling.” The purpose of the constitutional prohibition of a plurality of subjects in a single legislative act is to prevent a single enactment from becoming a “cloak” for dissimilar legislation, having no necessary or appropriate connection with the subject matter. However, the court continued that this constitutional provision is not designed to deter or impede legislation by requiring laws to be unnecessarily restrictive in their scope and operation. The court also noted that wide latitude must be accorded the Legislature in the enactment of laws.
In Smith v. Department of Insurance, 507 So.2d 1080 (Fla.1987), the court distinguished between the single subject requirement for constitutional initiative petitions (Art. XI, § 3) and thé single subject requirement for legislative acts at issue here. With regard to legislative acts, the court has taken a broader view of this restriction because there is an opportunity for legislative debate and public hearing which is not available under the provisions for constitutional initiatives. The court noted that the standard is a practical one:
The test to determine whether legislation meets the single-subject requirement is based on common sense. It requires examining the act to determine if the provisions ‘are fairly and naturally germane to the subject of the act, or are such as are necessary incidents to or tend to make effective or promote the objects and purposes of legislation included in the subject.’
507 So.2d at 1087.
In the present case, the title to chapter 96-323 reflects that it relates to transportation, road projects, fuel and taxes, among other things. With regard to section 206.9815 and 206.9825, the title states that it amends these sections, defines the terms “kerosene” and “aviation gasoline,” provides requirements for applying the aviation fuel tax to these items, and provides for exemptions, refunds and a backup tax.
Since the title specifically provides that the aviation fuel tax will be applied to kerosene and that the act will define kerosene, there appears to be no intent on the part of the legislature to “log roll.” The title of the act would have put the public on notice that the legislature was defining the term “kerosene” and applying the aviation fuel tax to it. Thus it does not appear *1216 that the act violates the single subject requirement. See Burch (statute prohibiting the buying and selling of cocaine within 1,000 of a school did not violate single subject requirement, even though statute dealt with comprehensive criminal regulations and procedures, money laundering and safe neighborhoods); Smith (tort reform and insurance act did not violate single subject requirement, even though act contained both insurance and tort reforms as well as provisions relating to financial responsibility requirements applicable to physicians); Chenoweth v. Kemp, 396 So.2d 1122 (Fla.1981) (chapter law which covered broad range of statutory provisions dealing with medical malpractice, tort litigation, and insurance reform did not violate one subject rule of the constitution).
AFFIRMED.
THOMPSON, C.J., and HARRIS, J., concur.

. In 1997, the parent company of Kaskam acquired USA.

. Section 206.87(2) provides:
(2)The taxes specified in this section are imposed on all of the following:
(a) The removal of diesel fuel in this state from a terminal if the diesel fuel is removed at the rack.
(b) The removal of diesel fuel in this state from any refinery if either of the following applies:
1. The removal is by bulk transfer and the owner of the diesel fuel immediately before the removal is not a licensed terminal supplier; or
2. The removal is at the refinery rack.
(c) The entry of diesel fuel into this state for sale, consumption, use, or warehousing if either of the following applies:
1. The entry is by bulk transfer and the enterer is not a licensed terminal supplier; or
2. The entry is not by bulk transfer.
(d) The removal of diesel fuel in this state to an unregistered person, unless there was a prior taxable removal, entry, or sale of the diesel fuel.
(e) The removal or sale of blended diesel fuel in this state by the blender thereof. The number of gallons of blended diesel fuel subject to tax is the difference between the total number of gallons of blended diesel fuel removed or sold and the number of gallons of previously taxed diesel fuel used to produce the blended diesel fuel.
Section 206.872 provides:
(1) Every position holder shall pay taxes on the removal of diesel fuel from a terminal as described by s. 206.87(2). In an exchange agreement between two licensed terminal suppliers, the receiving party shall be liable as the position holder if the receiving party is identified to the terminal operator by the delivering party.
(2) Every terminal supplier shall pay taxes on the removal of diesel fuel from a refinery as specified by s. 206.87(2)(b).
(3) Every importer shall pay taxes on the entry into this state as specified by s. 206.87(2)(c).
(4) Any person that produces blended diesel fuel outside the bulk transfer or terminal system shall pay taxes as provided for by s. 206.87(2)(e).
(5) Any person using diesel fuel in a use which is not exempt under s. 206.874 is liable for the backup tax imposed under s. 206.873.
(6) The seller of diesel fuel is jointly and severally liable for the backup tax imposed under s. 206.873 if the seller knows or has reason to know that the diesel fuel will be used in any nonexempt use.
(7) The terminal operator is jointly and severally liable for the taxes imposed under s. 206.87 if:
(a) The position holder with respect to the diesel fuel is a person other than the terminal operator and is not a terminal supplier; or
(b) The terminal operator has not met the conditions specified under subsection (8).
(8) A terminal operator is not liable for taxes imposed under s. 206.87 if at the time of the removal all the following apply:
(a) The terminal operator is a terminal supplier.
(b) The terminal operator has an unexpired notification certificate from the position holder as required by the Internal Revenue Service.
(c) The terminal operator has no reason to believe that any information in the certificate is false.
(9) The terminal operator is jointly and severally liable for the taxes imposed under s. 206.87 if, in connection with the removal of diesel fuel that is not dyed and marked in accordance with United States Environmental Protection Agency or Internal Revenue Service requirements, the terminal operator provides any person with any bill of lading, shipping paper, or similar document indicating that the diesel fuel is dyed and *1213 marked in accordance with United States Environmental Protection Agency or Internal Revenue Service requirements.
(10) A licensed importer, a position holder in a terminal located outside of this state, or a seller transferring ownership of diesel fuel outside of this state may enter into an agreement with the department for diesel fuel destined for this state whereby the position holder or the seller of diesel fuel agrees to be subject to the laws of this state and comply with the provisions of this chapter in the same manner as if the diesel fuel were withdrawn from a terminal in this state or the transfer of ownership occurred in this state.
(11)(a) Any person who willfully evades or attempts to evade or defeat the payment of the fuel taxes imposed by this part is subject to an assessable penalty. For each offense such person shall be subject to a penalty of $10 for every gallon of diesel fuel involved or $1,000, whichever is greater. The penalty increases with subsequent violations by multiplying the penalty amount by the number of prior violations. The penalty applies in any of the following circumstances:
1. If any dyed diesel.fuel is sold or held for sale by any person for any use that such person knows or has' reason to know is not a nontaxable use of such diesel fuel.
2. If any dyed diesel fuel is held for use or used by any person for a use other than a nontaxable use and such person knew, or had reason to know, that such diesel fuel was so dyed. ''
3. If any person willfully, with intent to evade tax, alters, or attempts to alter, the strength or composition of any dye or marker in any dyed diesel fuel.
(b) Any business entity and each officer, employee, or agent of the eli’tity who willfully participated in any act giving rise to the penalty is jointly and severally liable with the entity for the penalty.